IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DR. T. ELON DANCY II, | Civil Action |
| Plaintiff, | No. |
| v. | |
| THE UNIVERSITY OF PITTSBURGH-OF THE COMMONWEALTH SYSTEM OF HIGHER EDUCATION and DR. EBONI M. ZAMANI-GALLAHER, | JURY TRIAL DEMANDED |
| Defendants. | |

**CIVIL COMPLAINT**

Plaintiff, Dr. T. Elon Dancy II, by undersigned counsel, files this Civil Complaint, and in support states the following.

### I. Jurisdiction and Administrative Exhaustion

1. Plaintiff invokes this Court's federal question jurisdiction pursuant to 28 U.S.C. § 1331.

2. Plaintiff has exhausted the administrative remedies set forth under the Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5 as follows:

   a. On October 1, 2024, he timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging discrimination based on gender, sexual orientation, race, and national origin;

   b. On October 22, 2024, he filed an amended charge of discrimination with the EEOC adding a claim for retaliation;

   c. On July 18, 2025, the U.S. Department of Justice Civil Rights Division issued a Notice of Right to Sue; and

   d. On August 14, 2025, the EEOC issued a Notice of Right to Sue; and

   e. Plaintiff filed this action within 90 days of receipt of both Notices.

1

## II.     Parties

3. Plaintiff, Dr. T. Elon Dancy II, is an adult male individual who resides in Allegheny County, Pennsylvania.

4. Defendant University of Pittsburgh-of the Commonwealth System of Higher Education ("University") is a state-related institute of higher education with a principal place of business in Pittsburgh, PA.

5. Defendant University operates a School of Education, where Dr. Dancy worked.

6. The School of Education's address is 5500 Wesley W. Posvar Hall, 230 S Bouquet St, Pittsburgh, PA 15260.

7. In 2024, Defendant employed more than 15 employees for each working day for at least 20 weeks of the calendar year.

8. Defendant Dr. Eboni M. Zamani-Gallaher ("Zamani-Gallaher") is an adult female individual who resides in Westmoreland County.

9. At all times relevant, Defendant Zamani-Gallaher was employed by Defendant University as either the Interim Dean or Dean of the School of Education.

10. At all times relevant, Defendant Zamani-Gallaher acted under the authority granted to her by Defendant University and by state law.

## III.  Facts

### A.  Background

11. On or around July 1, 2018, Dr. Dancy began working at Defendant University as Director and Professor with tenure of the Center for Urban Education ("CUE") and as Helen S. Faison Endowed Chair.

12. The CUE is a center within Defendant University's School of Education ("SoE") that focuses on serving urban communities and understanding the larger social system that impacts learning overall.

13. In or around August 2020, Dr. Dancy was promoted by then-Dean of the SoE, Valerie Kinloch, to serve as Associate Dean for Equity and Justice in the SoE and Executive Director of the CUE.

14. Dr. Dancy is a renowned and published scholar in the areas of Black intellectual thought, men and masculinities, structural oppression, and related school and higher education issues.

15. Dr. Dancy holds faculty appointments in Defendant University's Department of Educational Foundations, Organizations, and Policy, as well as in Africana Studies and Gender, Sexuality, and Women's Studies.

16. Dr. Dancy identifies as a Black, gay man, who is married to a man of Islamic faith.

17. On or around August 2023, Defendant University hired Defendant Zamani-Gallaher as the interim-Dean of the SoE.

18. Defendant University hired Defendant Zamani-Gallaher for the Dean role permanently on May 1, 2024.

19. Defendant Zamani-Gallaher's interim and permanent appointment occurred after her husband, James Gallaher, was appointed Vice Chancellor for Human Resources.

**B. Students Protest Against the Genocide of Palestinian Men, Women, and Children and Call for Dean Zamani-Gallaher's Resignation.**

20. After the conflict between Israel and Palestine escalated in late 2023, students at Defendant University began exercising their First Amendment right to speak out against the war and the treatment of Gazans by the Israeli government.

21. War and international affairs are political issues and matters of public concern.

22. Through January 2024, neither Defendant University, nor its SoE had publicly taken a position on the conflict in Gaza.

23. On January 16, 2024, a number of current students, prospective students, and University affiliates penned a letter addressed to Defendant Zamani-Gallaher.

24. This group of individuals signed this letter as "University of Pittsburgh School of Education Palestinian Solidarity Collective" ("the Collective").

25. In their letter, the Collective made demands of Defendant University's SoE, including *inter alia*, an increase in educational efforts and professional development, and additional programing directed and facilitated through the CUE and the Kinloch Commons for Critical Pedagogy.

26. Also in the letter, the CUE, under the direction of Dr. Dancy, and Kinloch Commons, under the direction of Dr. Sabina Vaught, were recognized for their work "that reflects [the] call for educational programming" on the war and identified an upcoming speaker series on Palestine and the study of liberation, identified by the Collective as the only action of this type within the SoE.

27. Indeed, Dr. Dancy facilitated the CUE co-presenting with the Commons study group programming titled, "Gaza for Educators and Organizers."

28. Defendant Zamani-Gallaher responded to the Collective three days later.

4

29. On January 29, 2024, Defendant Zamani-Gallaher received a response signed by the Collective, Students for Justice in Palestine, other campus organizations, and a number of named and un-named individuals.

30. In its letter, this group criticized Defendant Zamani-Gallaher's response as "dishearteningly inadequate, demonstrating a failure to seriously consider the points [] raised[,]" and described her as "asleep at the wheel when called in to intervene on Zionist [] violence with the indigenous people of Palestine."

31. As an additional demand in its letter, this group called for Defendant Zamani-Gallaher's immediate resignation from the position of Interim Dean of Defendant University's SoE.

32. On January 29, 2024, Dr. Lori Delale-O'Connor emailed SoE senior administrators, including Dr. Dancy, that this second letter "singles out Interim Dean Zamani-Gallaher in a deeply problematic way" and invited these colleagues in the SoE to "discuss a response specific to the SoE that allows us to support Interim Dean Zamani-Gallaher[.]"

33. On January 30, 2024, Dr. Dancy co-authored an email with Dr. Sabina Vaught to Dr. Delale-O'Connor and the senior administrators, including Defendant Zamani-Gallaher, stating he "read frustration, both with what the student authors seem to express as being brushed off or dismissed by the interim dean and with their perception of the SoE's misalignment with its mission-vision." Dr. Dancy also said, "We read the letters as students holding us accountable to the university's role in global liberation against antiblackness (and its genocidal expressions) through curriculum, pedagogy, and institutional organization."

34. Dr. Dancy and Dr. Vaught also asked for the SoE to have a constructive dialogue with the student authors and cautioned against punishment for SoE students.

### C. Defendant Zamani-Gallaher Attempts to Persuade a Student to Dissociate with Dr. Dancy

35. In or around April 2024, Defendant Zamani-Gallaher attended the Council for the Study of Community Colleges' Annual Conference. Dr. Dancy was not present.

36. Without notifying Dr. Dancy, Defendant Zamani-Gallaher invited to the Conference a doctoral student accepted into the urban education program to work under Dr. Dancy's faculty supervision.

37. This student attended the Conference, but not Dr. Dancy.

38. Defendant Zamani-Gallaher approached this student at the Conference and questioned why he was not working with a different professor, and offered him a competing financial package that would only be available should he choose not to work with Dr. Dancy.

39. Upon information and belief, Defendant Zamani-Gallaher was told by a witness to this conversation that she shouldn't interfere with this student's choice of advisors.

40. Further, Defendant Zamani-Gallaher told this student that the reason he should find another advisor was because Dr. Dancy had "allowed his students" to write a letter calling for her resignation, and that this was problematic because she is a Black woman.

41. Laurel Gift, Assistant Vice Chancellor in Defendant University's Office of Compliance, Investigations, and Ethics ("OCIE"), received a report from a professor of Defendant University describing what Defendant Zamani-Gallaher said to this student, as alleged in the previous paragraph.

42. Dr. Dancy reported the incident between Dean Zamani-Gallaher and his student to Laurel Gift in OCIE and Defendant University's Title IX office.

43. In his incident report, Dr. Dancy attributed Defendant Zamani-Gallaher's comments to gender and sex discrimination, stating that the messaging is that, "as a gay person

6

married to a man, I am not only defective in my sexual orientation, but that I also cannot perform my gender correctly and therefore can not perform my role as a School faculty member or advisor (or any role) correctly."

### D. External Review of the CUE

44. On or around May 31, 2024, Defendant Zamani-Gallaher initiated an external review of the CUE.

45. Defendant Zamani-Gallaher communicated inconsistent rationales for initiating the review.

46. Defendant Zamani-Gallaher included as a stakeholder in the external review a former dean who had expressed disdain for CUE's programming, indicating that he would withdraw philanthropic support and disagreeing with Dr. Dancy's use of the term "genocide" to describe circumstances in Gaza.

47. In an email to Defendant Zamani-Gallaher, Dr. Dancy opposed her inclusion of the former dean due to potential bias, but she included him anyway.

48. On or about September 17, 2024, the external review report was completed.

49. On September 18, 2024, Dr. Dancy emailed Defendant Zamani-Gallaher that he noted within the external review many inaccuracies and fallacies which call attention to significant design issues in the evaluation and reporting.

50. Dr. Dancy later provided a detailed complaint to Ms. Gift in OCIE about the external review process and the resulting report.

51. Dr. Dancy and Defendant Zamani-Gallaher were in the process of scheduling a time to discuss the external report when she abruptly removed him from his position as CUE Director and Helen S. Faison Endowed Chair.

52. The external review report did not recommend Dr. Dancy's termination or removal from the CUE.

53. Other programs in the SoE were subject to external reviews, but those program directors were treated more favorably.

54. For example, the female director for one program that received an external review was promoted.

55. On October 3, 2024, Dr. Dancy submitted a complaint to Ms. Gift concerning the external review process and the results contained in the external review report.

56. In his complaint, Dr. Dancy addressed the failures in the external review process and in the resulting report, and requested an investigation into the discriminatory and retaliatory motivations.

**E. Defendant Zamani-Gallaher Humiliates and Undermines Dr. Dancy and the CUE to the Entire School of Education**

57. On September 6, 2024, Defendant University held a SoE meeting in which most faculty and staff of the SoE were in attendance.

58. In this meeting, Defendant Zamani-Gallaher told attendees that Superintendent of Pittsburgh Public Schools ("PPS"), Dr. Wayne Walters, said he did not feel that the CUE was useful.

59. A few days later, Dr. Dancy spoke to Dr. Walters and learned that this comment was not truthful and that Dr. Walters instead said he wanted to build a direct and deep partnership between PPS and the CUE.

60. On or around September 11, 2024, a professor in Dr. Dancy's Department at Defendant University who attended the September 6 meeting wrote to Dr. Dancy stating:

> I am so sorry that the dean was publicly inappropriate about CUE in Friday's faculty school-wide meeting. I'm guessing that you have had more than your fill of words about this, but please know that I have not talked to one person who didn't cringe at that. Not good. I'm not sure if anyone has apologized to you, Elon, but you are owed an apology.

**F. Other Title IX and Ethics Complaints to OCIE**

61. Laurel Gift in OCIE received a number of complaints relating to Defendant Zamani-Gallaher's conduct, including but not limited to her conduct at the September 6 meeting.

62. On September 9, 2024, Ms. Gift received a complaint from a SoE professor, on which Dr. Dancy was copied, regarding Defendant Zamani-Gallaher's conduct.

63. This complaint stated in part:

> During the school-wide faculty meeting on Friday, Dean Zamani-Gallaher made deeply concerning comments, particularly regarding her interpretation—or more accurately, her undermining—of Pitt's policies on academic freedom and the free exchange of ideas. When the topic of academic freedom appeared in her presentation slides, the dean hesitated to engage fully. Instead, she referenced an incident from the November 2023 TLL Department meeting—a meeting she did not attend, which I discussed with you in previous correspondence. At that meeting, faculty . . . raised serious concerns about the department's "business as usual" stance amid the genocidal violence unfolding in Gaza. Several faculty members, staff, and students expressed deep distress over the ongoing violence, and some of us highlighted the parallels to the entrenched racist work conditions endured by Black and Brown faculty within the School of Education (SOE). These concerns were dismissed outright, and the dean's later framing of the meeting as "disrespectful" serves to reinforce the ideological positions of those who seek to invalidate any critical engagement with antiblackness and global violence. This response not only compounds the existing tensions within the department but exposes the broader structural indifference to both local and global forms of racialized violence across SOE.
>
> What is particularly troubling is the dean's continued framing of critical discourse as inappropriate, uncivil, and uncollegial, a stance she reinforced during Friday's faculty meeting. Her labeling of dissenting faculty as

"disrespectful" represents a grave mischaracterization of the essential role of critical dialogue in the academic environment and serves as a veiled attempt to police the boundaries of academic freedom. By suggesting that academic freedom comes with certain restrictions, the dean undermines the spirit of free inquiry foundational to academia. Her refusal to articulate the limits she imposes on the "respect" she demands raises serious concerns about whether faculty can continue to engage with pressing global issues—such as genocidal violence—without fear of being subjected to retaliation for perceived "disrespect." It is worth mentioning that a white faculty member in that November 2023 meeting connected it to an instance when the previous dean paused a meeting to address the collective distress in the wake of George Floyd's murder. That juxtaposition exposes the glaring inconsistency in the school's response to genocidal violence.

Additionally, the dean's recollection of a conversation she supposedly had with the Superintendent of Pittsburgh Public Schools—where the superintendent allegedly questioned whether CUE had provided any tangible services to the district—was unclear, especially as none of us were present for the conversation with him. Her vague account of what the superintendent said further muddied the situation, making it difficult to determine whether her statements were a critique of the School of Education or simply misinterpretations of what was purportedly relayed to her. Her remarks about the Center for Urban Education were inaccurate and indicative of a deliberate effort to delegitimize the center's work. Rather than addressing the superintendent's potential misunderstanding, the dean used the moment to criticize CUE as disengaged.

… I can attest to the numerous impactful programs and initiatives . . . implemented within Pittsburgh Public Schools and the broader community. Thus, her remarks about the center were not only factually inaccurate but also dismissive of CUE's significant impact. After hearing her comments, I contacted Dr. T. Elon Dancy, Director of CUE, who confirmed that he had already submitted a comprehensive report detailing the center's extensive work. The dean's failure to acknowledge this report suggests that her comments were not the result of ignorance or confusion but part of a broader, calculated effort to discredit the center and its leadership, reflecting a pattern of hostility.

I have witnessed the dean's cold and hostile behavior two separate occasions, particularly in her interactions with [a student]. The first instance occurred when [individuals] encountered the dean and the external committee reviewing CUE, whom I had just met virtually, on the escalator in Posvar. Despite the committee members greeting me and my response to them, the dean intentionally ignored [the individuals]. In the second instance . . . the dean—accompanied by her daughter—acknowledged [an individual] coldly with "Good evening," but deliberately turned her head

away from [another individual]. These interactions were not isolated but symptomatic of a broader retaliatory attitude toward students like [this student], who had called for her resignation following her inaction on student demands for educational programming related to Gaza. Since then, her behavior toward [this student] and other student activists has been consistently chilly, distant, and overtly dismissive.

The dean's pattern of hostility towards those . . . who have raised concerns about Gaza and other critical issues is undeniable. Since the students' letter calling for her resignation—rooted in her inaction on the very leadership principles she espouses in her scholarship—many . . . have experienced subtle but pernicious forms of retaliation. From public scoldings to exclusion and discrediting, the retaliatory actions we have experienced are clear signs of an increasingly toxic and untenable environment. This escalation of hostility, particularly towards pre-tenure faculty and vulnerable doctoral students, is alarming and creates an environment of fear and intimidation. It is deeply unsettling that a dean would target students and junior faculty in this manner, effectively endangering our careers.

### G. Retaliation and Termination

64. On September 27, 2024, Dr. Dancy filed a charge of discrimination with the EEOC describing the ongoing discrimination by Defendant Zamani-Gallaher.

65. On October 7, 2024, Dr. Dancy emailed Ms. Gift to inform her that he filed the charge concerning the conduct of Defendant Zamani-Gallaher.

66. Defendant Zamani-Gallaher's husband is the Vice Chancellor in the Human Resources Department.

67. As such, Dr. Dancy informed Ms. Gift instead of an individual in Human Resources because he feared retaliation.

68. Two days later, Defendant Zamani-Gallaher removed Dr. Dancy from his roles as Executive Director of the CUE and the Helen S. Faison Endowed Chair.

69. In the removal notice, Defendant Zamani-Gallaher told Dr. Dancy it was "time to pursue new leadership."

70. Dr. Dancy was replaced by two female interim co-directors who are both less qualified by faculty rank, research, and professional experience.

71. Specifically, Defendant University replaced Dr. Dancy with Dr. Lori Delale-O'Connor and Dr. Sirry Alang.

72. Dr. Alang expressed upset to Dr. Dancy for his critique of a letter she wrote regarding the genocide in Palestine.

73. Dr. Alang has also been the subject of an OCIE investigation after withholding a scholarship award to Dr. Dancy's student, a lead organizer with student protestors.

74. Dr. Alang later emailed Dr. Delale O'Connor and a colleague outside of Defendant University stating: "One thing I know is that Dr. Dancy was not removed for the critical work he does and will hopefully continue to do," and, "Perhaps, specific reasons behind such decisions might be personnel issues that are between Dr. Dancy, the dean, and human resources, not privy to the rest of us."

**H. Defendants Terminate Sabina Vaught's Contract**

75. On February 6, 2025, Defendants notified Sabina Vaught that her contract as Director of the Kinloch Commons for Critical Pedagogy and Leadership in the SoE would not be renewed.

76. In the non-renewal letter, Defendant Zamani-Gallaher gave Dr. Vaught no explanation of the decision.

77. Dr. Vaught co-sponsored the Gaza programming with Dr. Dancy and also co-authored the January 30 email to the School of Education administration advocating against punishment for the students that called for the Dean's resignation.

## COUNT I
## First Amendment Retaliation
## Dr. Dancy v. All Defendants

78. Plaintiff incorporates by reference the allegations of the preceding Paragraphs as if fully restated.

79. Defendants removed Dr. Dancy from his Endowed Chair and CUE Director positions because of his political affiliation and/or beliefs, in violation of his right to belief and association under the First and Fourteenth Amendments of the U.S. Constitution and 42 U.S.C. §1983.

80. Defendants removed Dr. Dancy from his Endowed Chair and CUE Director positions because of the speech on matters of public concern by citizens with whom Dr. Dancy had an actual or perceived association, in violation of the First and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. § 1983.

81. In filing a charge of discrimination with the Equal Employment Opportunity Commission, and by filing a complaint with OCIE, Dr. Dancy exercised his right under the First and Fourteenth Amendments to petition the government for redress.

82. Defendants removed Dr. Dancy from his Endowed Chair and CUE Director positions because of his exercise of his rights to petition the government, in violation of the First and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. § 1983.

83. In terminating Dr. Dancy's appointments, Defendant Zamani-Gallaher acted under color of state law, by virtue of the authority granted to her by Defendant University as Dean of the SoE, inasmuch as her conduct, as set forth at length above, constitutes misuse of power possessed solely by virtue of state law and made possible only because she is and was clothed with the authority of state law.

84. Defendant Zamani-Gallaher's actions toward Dr. Dancy were intentional and were undertaken with reckless disregard of his federally protected right to not have his employment conditioned on his acquiescence to a cause he prefers not to support.

85. The conduct by Defendant Zamani-Gallaher, as set forth above, was a conscious choice to disregard Dr. Dancy's constitutional rights, and deprived Dr. Dancy, under color of state law, of rights guaranteed by the First and Fourteenth Amendments of the U.S. Constitution, in violation of 42 U.S.C. §1983.

86. Defendant Zamani-Gallaher acted in a policy-making capacity in terminating Dr. Dancy's appointments, such that Defendant University is responsible for her actions, in whole or in part.

87. As a direct and proximate result of Defendants' conduct, Dr. Dancy has suffered extreme emotional distress, lost wages, loss of reputation, humiliation, inconvenience, and like injuries.

## Count II
## Title VII: Sex Discrimination
## Dr. Dancy v. University of Pittsburgh

88. Plaintiff incorporates by reference the allegations of the preceding Paragraphs as if fully restated.

89. Defendant removed Dr. Dancy from his Endowed Chair and CUE Director positions because of his sex and sexual orientation, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a).

## Count III
## Title VII: Retaliation
## Dr. Dancy v. University of Pittsburgh

90.    Plaintiff incorporates by reference the allegations of the preceding Paragraphs as if fully restated.

91.    Defendants removed Dr. Dancy from his Endowed Chair and CUE Director positions because he filed a charge of discrimination with the EEOC, and/or because he opposed discrimination internally, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a).

**Damages/Harm**

87.    As a direct and proximate result of each of the above violations, Dr. Dancy has suffered damages, including lost wages and benefits, emotional distress, loss of reputation, humiliation, inconvenience, and like injuries.

WHEREFORE, Plaintiff demands judgment against Defendants, and requests that the Court order the following relief:

   a. Defendant University shall compensate Plaintiff for the full value of wages he would have received had it not been for Defendants' illegal treatment of Plaintiff, with interest and grossed up for negative tax consequences, until the date Plaintiff is offered employment into a position with a compensation package substantially equivalent to the one which Plaintiff occupied;

   b. Defendant University shall reinstate Plaintiff into the positions he held, together with all benefits incident thereto, including, but not limited to wages, commissions, stock units, fringe benefits, training and seniority; or shall provide Plaintiff with front pay in the event reinstatement is not feasible;

   c. Defendant Zamani-Gallaher shall pay Plaintiff punitive damages to punish Defendant and deter like conduct under Count I;

   d. Defendants shall pay Plaintiff compensatory damages for emotional distress, humiliation, reputational harm, inconvenience, and like injuries under all Counts;

    e. Defendants shall be enjoined from discriminating against Plaintiff in any manner that violates Title VII or the U.S. Constitution.

    f. Defendants shall pay Plaintiff and/or his counsel the costs and expenses of this litigation and reasonable attorneys' fees; and

    g. Plaintiff shall be granted such further legal and equitable relief as the Court may deem just and proper.

Respectfully submitted,

**ELZER LAW FIRM, LLC**

*/s/ Tamra K. Van Hausen*
Tamra K. Van Hausen
Pa. I.D. No. 330577
Christine T. Elzer
Pa. I.D. No. 208157

960 Penn Avenue Suite 1001
Pittsburgh, PA 15222
(412) 230-8436
tvanhausen@elzerlaw.com
celzer@elzerlaw.com

Attorneys for Plaintiff